# SUPREME COURT OF THE UNITED STATES

No. 24A931

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* J. G. G., ET AL.

ON APPLICATION TO VACATE THE ORDERS ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

[April 7, 2025]

PER CURIAM.

This matter concerns the detention and removal of Venezuelan nationals believed to be members of Tren de Aragua (TdA), an entity that the State Department has designated as a foreign terrorist organization. See 90 Fed. Reg. 10030 (2025). The President issued Proclamation No. 10903, invoking the Alien Enemies Act (AEA), Rev. Stat. §4067, 50 U. S. C. §21, to detain and remove Venezuelan nationals "who are members of TdA." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13034. Five detainees and a putative class sought injunctive and declaratory relief against the implementation of, and their removal under, the Proclamation. Initially, the detainees sought relief in habeas among other causes of action, but they dismissed their habeas claims. On March 15, 2025, the District Court for the District of Columbia issued two temporary restraining orders (TROs) preventing any removal of the named plaintiffs and preventing removal under the AEA of a provisionally certified class consisting of "[a]ll noncitizens in U.S. custody who are subject to" the Proclamation. Minute Order on Motion To Certify Class in No. 25−cv−00766. On March 28, the District Court extended the TROs for up to an additional 14 days. See Fed. Rule Civ. Proc. 65(b)(2).

The D. C. Circuit denied the Government's emergency mo-
tion to stay the orders. The Government then applied to
this Court, seeking vacatur of the orders. We construe
these TROs as appealable injunctions. See *Carson* v. *Amer-
ican Brands, Inc.*, 450 U. S. 79, 84 (1981).

We grant the application and vacate the TROs. The de-
tainees seek equitable relief against the implementation of
the Proclamation and against their removal under the AEA.
They challenge the Government's interpretation of the Act
and assert that they do not fall within the category of re-
movable alien enemies. But we do not reach those argu-
ments. Challenges to removal under the AEA, a statute
which largely "'preclude[s] judicial review,'" *Ludecke* v.
*Watkins*, 335 U. S. 160, 163−164, (1948), must be brought
in habeas. Cf. *Heikkila* v. *Barber*, 345 U. S. 229, 234−235
(1953) (holding that habeas was the only cause of action
available to challenge deportation under immigration stat-
utes that "preclud[ed] judicial intervention" beyond what
was necessary to vindicate due process rights). Regardless
of whether the detainees formally request release from con-
finement, because their claims for relief "'necessarily imply
the invalidity'" of their confinement and removal under the
AEA, their claims fall within the "core" of the writ of habeas
corpus and thus must be brought in habeas. Cf. *Nance* v.
*Ward*, 597 U. S. 159, 167 (2022) (quoting *Heck* v. *Humph-
rey*, 512 U. S. 477, 487 (1994)). And "immediate physical
release [is not] the only remedy under the federal writ of
habeas corpus." *Peyton* v. *Rowe*, 391 U. S. 54, 67 (1968); see,
*e.g.*, *Nance*, 597 U. S., at 167 (explaining that a capital pris-
oner may seek "to overturn his death sentence" in habeas
by "analog[y]" to seeking release); *In re Bonner*, 151 U. S.
242, 254, 259 (1894). For "core habeas petitions," "jurisdic-
tion lies in only one district: the district of confinement."
*Rumsfeld* v. *Padilla*, 542 U. S. 426, 443 (2004). The detain-
ees are confined in Texas, so venue is improper in the Dis-
trict of Columbia. As a result, the Government is likely to

succeed on the merits of this action.

The detainees also sought equitable relief against summary removal. Although judicial review under the AEA is limited, we have held that an individual subject to detention and removal under that statute is entitled to "'judicial review'" as to "questions of interpretation and constitutionality" of the Act as well as whether he or she "is in fact an alien enemy fourteen years of age or older." *Ludecke*, 335 U. S., at 163–164, 172, n. 17. (Under the Proclamation, the term "alien enemy" is defined to include "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States." 90 Fed. Reg. 13034.) The detainees' rights against summary removal, however, are not currently in dispute. The Government expressly agrees that "TdA members subject to removal under the Alien Enemies Act get judicial review." Reply in Support of Application To Vacate 1. "It is well established that the Fifth Amendment entitles aliens to due process of law" in the context of removal proceedings. *Reno* v. *Flores*, 507 U. S. 292, 306 (1993). So, the detainees are entitled to notice and opportunity to be heard "appropriate to the nature of the case." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950). More specifically, in this context, AEA detainees must receive notice after the date of this order that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs.

For all the rhetoric of the dissents, today's order and *per curiam* confirm that the detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal. The only question is which court will resolve that challenge. For the reasons set forth, we

hold that venue lies in the district of confinement. The dissents would have the Court delay resolving that issue, requiring—given our decision today—that the process begin anew down the road. We see no benefit in such wasteful delay.

The application to vacate the orders of the United States District Court for the District of Columbia presented to THE CHIEF JUSTICE and by him referred to the Court is granted. The March 15, 2025 minute orders granting a temporary restraining order and March 28, 2025 extension of the United States District Court for the District of Columbia, case No. 1:25-cv-766, are vacated.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 24A931

### DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* J. G. G., ET AL.

ON APPLICATION TO VACATE THE ORDERS ISSUED BY
THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

[April 7, 2025]

JUSTICE KAVANAUGH, concurring.

I agree with the Court's *per curiam* opinion. Importantly, as the Court stresses, the Court's disagreement with the dissenters is not over *whether* the detainees receive judicial review of their transfers—all nine Members of the Court agree that judicial review is available. The only question is *where* that judicial review should occur. That venue question turns on whether these transfer claims belong in habeas corpus proceedings or instead may be brought under the Administrative Procedure Act. I agree with the Court's analysis that the claims must be brought in habeas.

I add only that the use of habeas for transfer claims is not novel. In the extradition context and with respect to transfers of Guantanamo and other wartime detainees, habeas corpus proceedings have long been the appropriate vehicle. See *LoBue* v. *Christopher*, 82 F. 3d 1081, 1082 (CADC 1996); *Kiyemba* v. *Obama*, 561 F. 3d 509, 512–513 (CADC 2009). That general rule holds true for claims under the Alien Enemies Act, the statute under which the Government is seeking to remove these detainees. See *Ludecke* v. *Watkins*, 335 U. S. 160, 163, 171, and n. 17 (1948). And going back to the English Habeas Corpus Act of 1679, if not earlier, habeas corpus has been the proper vehicle for detainees to bring claims seeking to bar their

transfers. See Habeas Corpus Act of 1679, 31 Car. 2, c. 2, §§11–12.

Especially given the history and precedent of using habeas corpus to review transfer claims, and given 5 U. S. C. §704, which states that claims under the APA are not available when there is another "adequate remedy in a court," I agree with the Court that habeas corpus, not the APA, is the proper vehicle here.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24A931

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* J. G. G., ET AL.

ON APPLICATION TO VACATE THE ORDERS ISSUED BY
THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

[April 7, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, and with whom JUSTICE BARRETT joins as to Parts II and III–B, dissenting.

Three weeks ago, the Federal Government started sending scores of Venezuelan immigrants detained in the United States to a foreign prison in El Salvador. It did so without any due process of law, under the auspices of the Alien Enemies Act, a 1798 law designed for times of war. Between the start of these removals and now, a District Court has been expeditiously considering the legal claims of a group of detainees (hereafter plaintiffs), who allege that their summary removal violates the Constitution and multiple statutes. The District Court ordered a pause on plaintiffs' removals until it could consider their motion for a preliminary injunction at a hearing tomorrow, on April 8. Still, a majority of the Court sees fit to speak to this issue today.

Critically, even the majority today agrees, and the Federal Government now admits, that individuals subject to removal under the Alien Enemies Act are entitled to adequate notice and judicial review before they can be removed. That should have been the end of the matter. Yet, with "barebones briefing, no argument, and scarce time for reflection," *Department of Education* v. *California*, 604 U. S. \_\_\_, \_\_\_

(2025) (KAGAN, J., dissenting) (slip op., at 2), the Court announces that legal challenges to an individual's removal under the Alien Enemies Act must be brought in habeas petitions in the district where they are detained.

The Court's legal conclusion is suspect. The Court intervenes anyway, granting the Government extraordinary relief and vacating the District Court's order on that basis alone. It does so without mention of the grave harm Plaintiffs will face if they are erroneously removed to El Salvador or regard for the Government's attempts to subvert the judicial process throughout this litigation. Because the Court should not reward the Government's efforts to erode the rule of law with discretionary equitable relief, I respectfully dissent.

I

A

This case arises out of the President's unprecedented peacetime invocation of a wartime law known as the Alien Enemies Act. See Act of July 6, 1798, ch. 66, 1 Stat. 577. Enacted in 1798 by a Congress consumed with fear of war with France, the Alien Enemies Act provided a wartime counterpart to the widely denounced Alien Friends Act, which granted the President sweeping power to detain and expel any noncitizen he deemed "dangerous to the peace and safety of the United States." Act of June 25, 1798, 1 Stat. 571. Unlike the Alien Friends Act, which lapsed in disrepute as James Madison deemed it "a monster that must for ever disgrace its parents," the Founders saw the Alien Enemies Act as a constitutional exercise of Congress's powers to "declare War," to "raise and support Armies," and to "provide for calling forth the Militia to . . . suppress Insurrections and repel Invasions." U. S. Const., Art. I, §8, cls. 11–15.[1]

_____

[1] Letter from J. Madison to T. Jefferson (May 20, 1798), in 30 Papers of Thomas Jefferson 358 (B. Oberg ed. 2003); see also Madison's Report

To that end, the Act grants the President power to detain and remove foreign citizens of a "hostile nation or government" when "there is a declared war" with such nation or when a "foreign nation" threatens "invasion or predatory incursion" against the territory of the United States. Rev. Stat. §4067, 50 U. S. C. §21. Before today, U. S. Presidents have invoked the Alien Enemies Act only three times, each in the context of an ongoing war: the War of 1812, World War I, and World War II.[2]

That changed on March 14, 2025, when President Trump invoked the Alien Enemies Act to address an alleged "Invasion of the United States by Tren De Aragua," a criminal organization based in Venezuela. See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, Proclamation No. 10903, 90 Fed. Reg. 13033. There is, of course, no ongoing war between the United States and Venezuela. Nor is Tren de Aragua itself a "foreign nation." §21. The President's Proclamation nonetheless asserts that Tren de Aragua is "undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction . . . of the Maduro regime in Venezuela." 90 Fed. Reg. 13034. Based on these findings, the Proclamation declares that "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua]" and are not "naturalized [citizens] or lawful permanent residents" are liable to "immediate apprehension, detention, and removal" as alien enemies. *Ibid.*

---

on the Virginia Resolution, in The Book of the Constitution 52 (E. Williams ed. 1833).

   [2] *Lockington* v. *Smith*, 15 F. Cas. 758, 758–759 (No. 8,448) (CC Pa. 1817) (discussing the War of 1812 proclamation); Declaring the Existence of a State of War With the German Empire and Setting Forth Regulations Prescribing Conduct Toward Alien Enemies, Proclamation No. 1364, 40 Stat. 1650 (World War I); Alien Enemies—Japanese, Proclamation No. 2525, 55 Stat. 1700 (World War II).

Congress requires the President to "mak[e] public proclamation" of his intention to invoke the Alien Enemies Act. §21. President Trump did just the opposite. In what can be understood only as covert preparation to skirt both the requirements of the Act and the Constitution's guarantee of due process, the Department of Homeland Security (DHS) began moving Venezuelan migrants from Immigration and Customs Enforcement detention centers across the country to the El Valle Detention Facility in South Texas before the President had even signed the Proclamation. ___ F. Supp. 3d ___, ___ 2025 WL 890401, *3 (D DC, Mar. 24, 2025). The transferred detainees, most of whom denied past or present affiliation with any gang, did not know the reason for their transfer until the evening of Friday, March 14, when they were apparently "pulled from their cells and told that they would be deported the next day to an unknown destination." *Ibid.*

B

Suspecting that the President had covertly signed a Proclamation invoking the Alien Enemies Act, several lawyers anticipated their clients' imminent deportation and filed a putative class action in the District of Columbia. App. to Brief in Opposition To Application To Vacate 9a (App. to BIO). They contested that Tren de Aragua had committed or attempted the kind of "'invasion'" or "'predatory incursion'" required to invoke the Alien Enemies Act. *Ibid.* They also asserted that it would violate the Due Process Clause to deport their clients before they had any chance to challenge the Government's allegations of gang membership. *Id.*, at 26a. The plaintiffs did not seek release from custody, but asked the court only to restrain the Government's planned deportations under the Proclamation. *Id.*, at 9a, 29a.

In the early morning of March 15, the District Court informed the Government of the lawsuit and scheduled an

emergency hearing. Despite knowing of plaintiffs' claim that it would be unlawful to remove them under the Proclamation, the Government ushered the named plaintiffs onto planes along with dozens of other detainees, all without any opportunity to contact their lawyers, much less notice or opportunity to be heard. See 2025 WL 890401, *5; see also, *e.g.*, Decl. of G. Carney in No. 25–cv–00766 (D DC, Mar. 19, 2025), ECF Doc. 44–11, at 2.

The Government's plan, it appeared, was to rush plaintiffs out of the country before a court could decide whether the President's invocation of the Alien Enemies Act was lawful or whether these individuals were, in fact, members of Tren de Aragua. Plaintiff J. G. G., for example, had no chance to tell a court that the tattoos causing DHS to suspect him of gang membership were unrelated to a gang. Decl. of J. G. G., ECF Doc. 3–3, at 1. He avers that he is a tattoo artist who "got [an] eye tattoo because [he] saw it on Google" and "thought it looked cool." *Ibid.* Plaintiff G. F. F., too, was denied the chance to inform a court that the Government accused him of being an "associate/affiliate of Tren d[e] Aragua" based solely on his presence at a party of strangers, which he attended at the "insistence of a friend." Decl. of G. Carney, ECF Doc. 3–4, at 1.

### C

Recognizing the emergency the Government had created by deporting plaintiffs without due process, the District Court issued a temporary restraining order that same morning. The order prohibited the Government from removing the five named plaintiffs, including J. G. G. and G. F. F., pending ongoing litigation. G. F. F., who had been "on a plane for about forty minutes to an hour" as "crying and frightened" individuals were forced on board, was subsequently retrieved from the plane by a guard who told him he "'just won the lottery.'" Decl. of G. Carney, ECF Doc. 44–11, at 3.

The court then set an emergency hearing for 5 p.m. that same day, at which it planned to consider plaintiffs' claim that temporary relief should be extended to a class of all noncitizens subject to the anticipated Proclamation. See 2025 WL 890401, *4. Despite notice to the Government of the Court's scheduled hearing, DHS continued to load up the two planes with detainees and scheduled their immediate departure. See Tr. 12 (Mar. 15, 2025) (Two flights "were scheduled for this afternoon that may have already taken off or [will] during this hearing"); Tr. 9 (Apr. 3, 2025) (Government counsel agreeing that DHS was "acting in preparation of the proclamation before it was posted"). Not until an hour before the District Court's scheduled hearing, and only moments before the Government planned to send its planes off to El Salvador, did the White House finally publish the Proclamation on its website.

At its 5 p.m. hearing, the District Court provisionally certified a class of Venezuelan noncitizens subject to the Proclamation. See Tr. 23, 25 (Mar. 15, 2025). It then issued an oral temporary restraining order prohibiting the Government from removing all members of the class pursuant to the Proclamation for 14 days. *Id.*, at 42. The order did not disturb the Government's ability to apprehend or detain individuals pursuant to the Proclamation or its authority to deport any individual under the Immigration and Naturalization Act. See *ibid.*; see 2025 WL 890401, *1. All it required of the Government was a pause in deportations pursuant to the Proclamation until the court had a chance to review their legality. See Tr. 4 (Apr. 3, 2025) ("All th[e] [TROs] did was order that the government could not summarily deport in-custody noncitizens who were subject to the proclamation without a hearing"). The court further directed that "any plane containing" individuals subject to the Proclamation "that is going to take off or is in the air needs to be returned to the United States." Tr. 43 (Mar. 15, 2025).

### D

Concerns about the Government's compliance with the order quickly followed. Even now, the District Court continues to investigate what happened via show-cause proceedings. In those proceedings, the Government took the position that it had no legal obligation to obey the District Court's orders directing the return of planes in flight because they were issued from the bench. See Tr. 17 (Mar. 17, 2025) ("[O]ral statements are not injunctions"). Of course, as the Government well knows, courts routinely issue rulings from the bench, and those rulings can be appealed, including to this Court, in appropriate circumstances.[3]

The District Court, for its part, has surmised that "the Government knew as of 10 a.m. on March 15 that the Court would hold a hearing later that day," yet it "hustled people onto those planes in hopes of evading an injunction or perhaps preventing [individuals] from requesting the habeas hearing to which the Government now acknowledges they are entitled." 2025 WL 890401, *5. Rather than turn around the planes that were in the air when the Court issued its order, moreover, the Federal Government landed the planes full of alleged Venezuelan nationals in El Salvador and transferred them directly into El Salvador's Center for Terrorism Confinement (CECOT). *Ibid.*

Deportation directly into CECOT presented a risk of extraordinary harm to these Plaintiffs. The record reflects

---

[3] See, *e.g.*, *United States* v. *Fruehauf*, 365 U. S. 146, 154 (1961) (hearing Government's direct appeal from oral ruling); *Evans* v. *Michigan*, 568 U. S. 313, 320 (2013) (relying on lower court's oral ruling); see also *Wright* v. *Continental Airlines Corp.*, 103 F. 3d 146 (CA10 1996) (Table) (oral ruling was binding on parties); *In re Justice*, 172 F. 3d 876 (CA9 1999) (Table) (oral order was binding and effective even when written order was never entered); *Ueckert* v. *Guerra*, 38 F. 4th 446, 451–452 (CA5 2022) (oral ruling final and appealable even where district court never issued written judgment).

that inmates in Salvadoran prisons are "'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'" *Id.*, at *16 (quoting App. to BIO 258a). CECOT detainees are frequently "denied communication with their relatives and lawyers, and only appear before courts in online hearings, often in groups of several hundred detainees at the same time." App. to BIO 260a. El Salvador has boasted that inmates in CECOT "'will never leave,'" *ibid.*, and plaintiffs present evidence that "inmates are rarely allowed to leave their cells, have no regular access to drinking water or adequate food, sleep standing up because of overcrowding, and are held in cells where they do not see sunlight for days," 2025 WL 890401, *16. One scholar attests that an estimated 375 detainees have died in Salvadoran prisons since March 2022. *Ibid.*

What if the Government later determines that it sent one of these detainees to CECOT in error? Or a court eventually decides that the President lacked authority under the Alien Enemies Act to declare that Tren de Aragua is perpetrating or attempting an "invasion" against the territory of the United States? The Government takes the position that, even when it makes a mistake, it cannot retrieve individuals from the Salvadoran prisons to which it has sent them. See Defendant's Memorandum of Law in Opposition in *Abrego Garcia* v. *Noem*, No. 25–cv–951 (D Md., Mar. 31, 2025), ECF Doc. 11, at 7–9. The implication of the Government's position is that not only noncitizens but also United States citizens could be taken off the streets, forced onto planes, and confined to foreign prisons with no opportunity for redress if judicial review is denied unlawfully before removal. History is no stranger to such lawless regimes, but this Nation's system of laws is designed to prevent, not enable, their rise.

### E

Even as the Government has continued to litigate

whether its March 15 deportations complied with the District Court's orders, it simultaneously sought permission to resume summary deportations under the Proclamation. The District Court, first, denied the Government's motion to vacate its temporary restraining order, rejecting the assertion that "the President's authority and discretion under the [Alien Enemies Act] is not a proper subject for judicial scrutiny." App. to BIO 71a. At the very least, the District Court concluded, the plaintiffs were "likely to succeed" on their claim that, "before they may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all." 2025 WL 890401, *2. The D. C. Circuit, too, denied the Government a requested stay and kept in place the District Court's pause on deportations under the Alien Enemies Act pending further proceedings. 2025 WL 914682, *1 (*per curiam*) (Mar. 26, 2025).

It is only this Court that sees reason to vacate, for the second time this week, a temporary restraining order standing "on its last legs." *Department of Education*, 604 U. S., at \_\_\_ (JACKSON, J., dissenting) (slip op., at 1). Not content to wait until tomorrow, when the District Court will have a chance to consider full preliminary injunction briefing at a scheduled hearing, this Court intervenes to relieve the Government of its obligation under the order.

## II

Begin with that upon which all nine Members of this Court agree. The Court's order today dictates, in no uncertain terms, that "individual[s] subject to detention and removal under the [Alien Enemies Act are] entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Ante,* at 2 (quoting *Ludecke* v. *Watkins*, 335 U. S. 160, 163–164, 172, n. 17 (1948)). Therefore, under today's order, courts below

will probe, among other things, the meaning of an "invasion" or "predatory incursion," 50 U. S. C. §21, and ask, for example, whether any given individual is in fact a member of Tren de Aragua. Even the Government has now largely conceded that point. Application 19.

So too do we all agree with the *per curiam*'s command that the Fifth Amendment requires the Government to afford plaintiffs "notice after the date of this order that they are subject to removal under the Act, . . . within reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Ante,* at 3. That means, of course, that the Government cannot usher any detainees, including plaintiffs, onto planes in a shroud of secrecy, as it did on March 15, 2025. Nor can the Government "immediately resume" removing individuals without notice upon vacatur of the TRO, as it promised the D. C. Circuit it would do. See 2025 WL 914682, *13 (Millett, J., concurring) (referencing oral argument before that court). To the extent the Government removes even one individual without affording him notice and a meaningful opportunity to file and pursue habeas relief, it does so in direct contravention of an edict by the United States Supreme Court.

### III

In light of this agreement, the Court's decision to intervene in this litigation is as inexplicable as it is dangerous. Recall that, when the District Court issued its temporary restraining order on March 15, 2025, the Government was engaged in a covert operation to deport dozens of immigrants without notice or an opportunity for hearings. The Court's ruling today means that those deportations violated the Due Process Clause's most fundamental protections. See *ante*, at 3 (reiterating that notice and an opportunity for a hearing are required before a deportation under the Alien Enemies Act). The District Court rightly intervened

to prohibit temporarily the Government from deporting more individuals in this manner, based on its correct assessment that the plaintiffs were likely entitled to more process. 2025 WL 890401, \*2.

Against the backdrop of the U. S. Government's unprecedented deportation of dozens of immigrants to a foreign prison without due process, a majority of this Court sees fit to vacate the District Court's order. The reason, apparently, is that the majority thinks plaintiffs' claims should have been styled as habeas actions and filed in the districts of their detention. In reaching that result, the majority flouts well-established limits on its jurisdiction, creates new law on the emergency docket, and elides the serious threat our intervention poses to the lives of individual detainees.

A

As an initial matter, the Court lacks jurisdiction to review the District Court's time-limited, interlocutory order. It is well established that, generally, "temporary restraining orders are not appealable." 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3922.1, p. 90 (3d ed. 2012). That rule is a general one because it gives way where a temporary restraining order risks imposing such an "'irreparable . . . consequence'" that an immediate appeal is necessary if the order is to be "'effectually challenged'" at all. *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 84 (1981).

Here, the District Court ordered a 14-day halt on deportations pursuant to the Proclamation (extended once for 14 additional days) because it thought the plaintiffs were likely entitled to "individualized hearings to determine whether the Act applies to them at all." 2025 WL 890401, \*2. The Government now admits that it must provide detainees with adequate notice, and it says they can then file habeas petitions in the Southern District of Texas to contest

and stay their removal under the Alien Enemies Act. Such proceedings, if adequately provided, necessarily mean that the Government cannot imminently deport the Plaintiffs under the Proclamation. So it is hard to see why the District Court's temporary restraining order (of which only five days now remain) presented the Government with an emergency of any kind, much less one that required an immediate appeal.

B

Also troubling is this Court's decision to vacate summarily the District Court's order on the novel ground that an individual's challenge to his removal under the Alien Enemies Act "fall[s] within the 'core' of the writ of habeas corpus" and must therefore be filed where the plaintiffs are detained. *Ante,* at 2. The Court reaches that conclusion without oral argument or the benefit of percolation in the lower courts, and with just a few days of deliberation based on barebones briefing.

This conclusion is dubious. As an initial matter, the majority's assertion that plaintiffs' claims "sound" in habeas is in tension with this Court's understanding of habeas corpus as, at its core, an avenue for a person in custody to "attack . . . the legality of that custody" and "to secure release from illegal custody." *Preiser* v. *Rodriguez*, 411 U. S. 475, 484 (1973). The plaintiffs in this case sued not to challenge their detention, but to protect themselves from summary deportation pursuant to the Proclamation. Indeed, because all of the plaintiffs were already in immigration detention under other statutes when the Government subjected them to the Proclamation, they "have repeatedly emphasized throughout this litigation that they 'do not seek release from custody'" and are not "contesting the validity of their confinement or seeking to shorten its duration." 2025 WL 890401, *8.

Nevertheless, the majority insists that plaintiffs' claims

"'necessarily imply the invalidity'" of their confinement and removal under the Act, and so essentially amount to a challenge to their present physical confinement. *Ante,* at 2. It therefore analogizes this case to the line of cases beginning with *Heck* v. *Humphrey*, 512 U. S. 477 (1994), where the Court held that individuals serving state criminal sentences cannot bring 42 U. S. C. §1983 suits to complain of "unconstitutional treatment at the hands of state officials" if a judgment in their favor would "necessarily imply the invalidity of his conviction or sentence." 512 U. S., at 480, 487. In such cases, habeas is the exclusive avenue for relief. *Ibid.* Plaintiffs' claims, however, do not "imply the invalidity of" their detention, because their detention predated the Proclamation and was unrelated to the Alien Enemies Act. Thus, if they succeeded in showing that they could not be removed under the Proclamation, that would not result in their release from detention. Even in the context of §1983 challenges by criminal defendants, this Court has never "recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody.'" *Skinner* v. *Switzer*, 562 U. S. 521, 534 (2011) (brackets omitted).

There is also good reason to doubt that *Heck*'s holding about the availability of relief under §1983 extends to Administrative Procedure Act (APA) claims challenging executive action under the Alien Enemies Act. The *Heck* bar arose from the Court reading an "'implicit exception'" into §1983 to avoid "swamping the habeas statute's coverage of claims that the prisoner is 'in custody in violation of the Constitution.'" *Nance* v. *Ward*, 597 U. S. 159, 167 (2022) (quoting 28 U. S. C. §2254(a)). This Court has never limited the availability of APA relief so narrowly. To the contrary, the APA has long been available to plaintiffs absent specific preclusion by Congress. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967).

Although the APA allows courts to review only agency action "for which there is no other adequate remedy in a court," 5 U. S. C. §704, this Court has long read that limitation narrowly, emphasizing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen* v. *Massachusetts*, 487 U. S. 879, 903 (1988); see also *Darby* v. *Cisneros*, 509 U. S. 137, 146 (1993) ("Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions"). Indeed, in the mid-20th century, this Court repeatedly said that habeas and APA actions were both available to noncitizens challenging their deportation orders. See *Brownell* v. *Tom We Shung*, 352 U. S. 180, 181 (1956) ("[E]ither remedy is available in seeking review of [deportation] orders"); see also *Shaughnessy* v. *Pedreiro*, 349 U. S. 48, 50–51 (1955) (allowing for judicial review of a deportation order under the APA).

Against that backdrop, there is every reason to question the majority's hurried conclusion that habeas relief supplies the exclusive means to challenge removal under the Alien Enemies Act. At the very least, the question is a thorny one, and this emergency application was not the place to resolve it. Nor was it the Court's last chance to weigh in. The debate about habeas exclusivity remains ongoing in the District Court, in the context of pending preliminary injunction proceedings. If the District Court were to resolve the question in plaintiffs' favor, the Government could have appealed to this Court in the ordinary course, and we could have decided it after thorough briefing and oral argument. In its rush to decide the issue now, the Court halts the lower court's work and forces us to decide the matter after mere days of deliberation and without adequate time to weigh the parties' arguments or the full record of the District Court's proceedings.

## C

The majority's rush to resolve the question is all the more troubling because this is not one of those rare cases in which the Court must immediately intervene "despite the risk" of error attendant in deciding novel legal questions on the emergency docket. *Department of Education*, 604 U. S., at ___, (KAGAN, J., dissenting) (slip op., at 2). Recall that the dispute has now narrowed into a debate about "which procedural vehicle is best situated for the Plaintiffs' injunctive and declaratory claims": individual habeas petitions filed in district courts across the country or a class action filed in the District of Columbia. 2025 WL 914682, *29 (Millett, J., concurring). The Government may well prefer to defend against "300 or more individual habeas petitions" than face this class APA case in Washington, D. C. *Ibid.* That is especially so because the Government can transfer detainees to particular locations in an attempt to secure a more hospitable judicial forum. But such a preference for defending against one form of litigation over the other is far from the kind of concrete and irreparable harm that requires this Court to take the "'extraordinary'" step of intervening at this moment, while litigation in the lower courts remains ongoing. *Williams* v. *Zbaraz*, 442 U. S. 1309, 1311 (1979) (Stevens, J., in chambers); see *Department of Education*, 604 U. S., at ___ (JACKSON, J., dissenting) (slip op., at 8).

Meanwhile, funneling plaintiffs' claims into individual habeas actions across the Nation risks exposing them to severe and irreparable harm. Rather than seeking to enjoin implementation of the President's Proclamation against all Venezuelan nationals in immigration detention, detainees scattered across the country must each obtain counsel and file habeas petitions on their own accord, all without knowing whether they will remain in detention where they were arrested or be secretly transferred to an alternative location. Cf. *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 860 (1999) ("One great advantage of class action treatment . . .

is the opportunity to save the enormous transaction costs of piecemeal litigation").

That requirement may have life or death consequences. Individuals who are unable to secure counsel, or who cannot timely appeal an adverse judgment rendered by a habeas court, face the prospect of removal directly into the perilous conditions of El Salvador's CECOT, where detainees suffer egregious human rights abuses. See *supra*, at 7–8. Anyone the Government mistakenly deports in its piecemeal and rushed implementation of the challenged Proclamation will face the same grave risks. Cf. Defendant's Memorandum of Law in Opposition in *Abrego Garcia* v. *Noem*, No. 25–cv–951 (D Md., Mar. 31, 2025), ECF Doc. 11, at 3.

The stakes are all the more obvious in light of the Government's insistence that, once it sends someone to CECOT, it cannot be made to retrieve them. *Ibid.* The Government is at this very moment seeking emergency relief from an order requiring it to facilitate the return of an individual the Government concededly removed to CECOT "because of an administrative error." *Id.*, at 5; see Emergency Motion for Stay Pending Appeal and Immediate Administrative Stay in *Abrego Garcia* v. *Noem*, No. 25–1345 (CA4, Apr. 5, 2025), ECF Doc. 3–1, at 2 ("No federal court has the power to command the Executive to engage in a certain act of foreign relations . . ."). The Government's resistance to facilitating the return of individuals erroneously removed to CECOT only amplifies the specter that, even if this Court someday declares the President's Proclamation unlawful, scores of individual lives may be irretrievably lost.

More fundamentally, this Court exercises its equitable discretion to intervene without accounting for the Government noncompliance that has permeated this litigation to date. The maxim that "'he who comes into equity must come with clean hands'" has long guided this Court's exercise of equitable discretion. *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806,

814 (1945). While "'equity does not demand that its suitors shall have led blameless lives'" as to other matters, "it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.*, at 814–815 (citing *Keystone Driller Co.* v. *General Excavator Co.*, 290 U. S. 240, 245 (1933)).

Far from acting "fairly" as to the controversy in District Court, the Government has largely ignored its obligations to the rule of law. From the start, the Government sought to avoid judicial review, "hustl[ing] people onto those planes" without notice or public Proclamation apparently "in the hopes of evading an injunction or perhaps preventing them from requesting the habeas hearing to which the Government now acknowledges they are entitled." 2025 WL 890401, *5. That the District Court is engaged in a sincere inquiry into whether the Government willfully violated its March 15, 2025, order to turn around the planes should be reason enough to doubt that the Government appears before this Court with clean hands. That is all the more true because the Government has persistently stonewalled the District Court's efforts to find out whether the Government in fact flouted its express order. See Tr. 4–5 (Mar. 15, 2025); Tr. 6–9 (Mar. 17, 2025).

\*        \*        \*

The Government's conduct in this litigation poses an extraordinary threat to the rule of law. That a majority of this Court now rewards the Government for its behavior with discretionary equitable relief is indefensible. We, as a Nation and a court of law, should be better than this. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 24A931

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL. *v.* J. G. G., ET AL.

ON APPLICATION TO VACATE THE ORDERS ISSUED BY
THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

[April 7, 2025]

JUSTICE JACKSON, dissenting.

I join JUSTICE SOTOMAYOR's dissent in full and would deny the application for all the reasons she explains. I write separately to question the majority's choice to intervene on the eve of the District Court's preliminary-injunction hearing without scheduling argument or receiving merits briefing. This fly-by-night approach to the work of the Supreme Court is not only misguided. It is also dangerous.

The President of the United States has invoked a centuries-old wartime statute to whisk people away to a notoriously brutal, foreign-run prison. For lovers of liberty, this should be quite concerning. Surely, the question whether such Government action is consistent with our Constitution and laws warrants considerable thought and attention from the Judiciary. That was why the District Court issued a temporary restraining order to prevent immediate harm to the targeted individuals while the court considered the lawfulness of the Government's conduct. But this Court now sees fit to intervene, hastily dashing off a four-paragraph *per curiam* opinion discarding the District Court's order based solely on a new legal pronouncement that, one might have thought, would require significant deliberation.

When this Court decides complex and monumental issues, it typically allows the lower courts to address those

matters first; it then receives full briefing, hears oral argument, deliberates internally, and, finally, issues a reasoned opinion.  Those standard processes may not always yield correct results.  But when we deviate from them, the risk of error always substantially increases.  Today's rushed conclusion—that those challenging the Government's action can only pursue their claims through habeas—is Exhibit A.

I lament that the Court appears to have embarked on a new era of procedural variability, and that it has done so in such a casual, inequitable, and, in my view, inappropriate manner.  See *Department of Education* v. *California*, 604 U. S. ___ , ___ (2025) (JACKSON, J., dissenting) (slip op., at 1–2).  At least when the Court went off base in the past, it left a record so posterity could see how it went wrong.  See, *e.g.*, *Korematsu* v. *United States*, 323 U. S. 214 (1944).  With more and more of our most significant rulings taking place in the shadows of our emergency docket, today's Court leaves less and less of a trace.  But make no mistake: We are just as wrong now as we have been in the past, with similarly devastating consequences.  It just seems we are now less willing to face it.